# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 05-CV-4863 (JFB) (WDW)
_____

ATLANTIC SPECIALTY INSURANCE COMPANY a/s/o ALLSTAR ELECTRONICS, INC.,

Plaintiff,

VERSUS

GOLD COAST DEVELOPMENTS, INC. & GOLD COAST DEVELOPMENT CORP.,

Defendants.

_____

MEMORANDUM AND ORDER
April 8, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Atlantic Specialty Insurance Company (hereinafter, "Atlantic") brought the instant case against defendants Gold Coast Developments Inc. and Gold Coast Development Corp. (collectively, the "defendants" or "Gold Coast"), alleging negligence, breach of contract, and breach of warranty. The lawsuit arises from water damage to property of New York D-Ram Exchange (hereinafter, "D-Ram") on January 11, 2004, allegedly caused by a freeze-up and rupture of a sprinkler system in the building where D-Ram was a tenant. This suit was filed by Altantic as property insurer and subrogee of Allstar Electronics, Inc. (hereinafter, "Allstar"), who was a named insurer under the same insurance policy as D-Ram, to recover the $322,000 that it paid Allstar as a result of the water damage.

Defendants moved for (1) the exclusion of the testimony of plaintiff's experts under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993); and (2) summary judgment on all three of plaintiff's claims. At oral argument, because it was undisputed that there was no written or oral lease agreement with defendants, counsel for plaintiff agreed to withdraw Count Two (breach of contract) and Count Three (breach of warranty) in the complaint. For the reasons stated below, defendants' motion to exclude the testimony of experts Steven Pietropaolo and Alec Hicks, Jr. is denied and the motion for summary judgment as to the negligence claim is denied. Because the defendants' motion to exclude the testimony of expert Paul Willigan relates only to damages and has no relevance to the summary judgment motion, the Court will not decide that motion at this juncture, but rather will address that motion in conjunction with

any other *in limine* motions made once a trial date has been set.

## I. BACKGROUND

The facts described below are taken from the parties' depositions, affidavits, exhibits, and Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir. 2001).

## A. Factual Background[1]

Gold Coast, Allstar, and D-Ram are all closely held corporations owned and controlled by the same principal, Tom Laviano. (Defs.' 56.1 ¶¶ 7,8,9.) Gold Coast's sole business was owning the premises located at 87 Bethpage Road, Hicksville, New York ("the premises"). (Defs.' 56.1 ¶ 11.) D-Ram and Allstar were both in the business of buying and selling surplus computer hardware, specifically computer "chips." (Defs.' 56.1 ¶ 10.) D-Ram operated its business from the premises until mid-January 2004. (Defs.' 56.1 ¶ 18.) There was no written lease between Gold Coast and D-Ram or Allstar. (Defs.' 56.1 ¶ 12.)

Within the drop ceiling or ceiling cavity above D-Ram's occupancy was a wet sprinkler system. (Defs.' 56.1 ¶ 21.) The heat supplied to rooms in the building warmed the space between the drop ceiling and the roof, where air was circulated back to the building's heating system though a "plenum" system.

---

[1] When one party's Rule 56.1 Statement is cited, the opposing party does not dispute that fact or has offered no evidence to controvert that fact.

(Pietropaolo Dep. at 88-93). Defendants note that this was also the area where the building's "wet" sprinkler system was located. The "wet" sprinkler system of the type in place at this location is kept in proper order by, among other things, maintaining adequate ambient temperature in the building, which would also warm the sprinklers and prevent freeze-up. (Defs.' 56.1 ¶ 23.) Plaintiff notes that additional methods may be employed to prevent freeze-ups including anti-freeze, insulation, or heating tape. (Pietropaolo Aff. at 2.) Defendants contend that there is a direct correlation between the heat in D-Ram's premises and the heat in the immediate vicinity of the sprinkler heads and system. (Defs.' 56.1 ¶ 25.) Plaintiff, however, denies that there is any direct correlation.

In the fall of 2003, D-Ram began moving its operation from 87 Bethpage Road, Hicksville, New York to the location of Allstar, at 20 Oser Avenue, Hauppague, New York. (Defs.' 56.1 ¶ 17.) On January 11, 2004, this moving process was still underway. (Defs.' 56.1 ¶ 18.) Much of the equipment and stock owned by D-Ram had been moved to the Happaugue location. (Defs.' 56.1 ¶ 18.) However, D-Ram continued to store some computer chips in the 87 Bethpage location. (Defs.' 56.1 ¶ 19.)

In January of 2004, D-Ram occupied the premises. (Defs.' 56.1 ¶ 5.) Allstar did not occupy the premises during this time period. (Defs.' 56.1 ¶ 6.) In the several days prior to January 11, 2004, the New York/Long Island region was struck by record low temperatures. (Defs.' 56.1 ¶ 27.) These low temperatures caused freeze-ups in buildings across Long Island and the New York metropolitan area. (Defs.' 56.1 ¶ 27.) On January 11, 2004, water unintendedly discharged from a

sprinkler system located on the premises, causing water damage to business and property. (Defs.' 56.1 ¶ 2.)

A dispute exists as to whether the freeze-up was a result of a defect in construction or maintenance of the building or the sprinkler system, or resulted from D-Ram's alleged failure to maintain the heat at a suitable temperature. Maintenance of the heat was handled by D-Ram employees Al Orlando and Tom Laviano. (Defs.' 56.1 ¶ 13.) Defendants assert that D-Ram paid for electric gas and heating at the premises. (Defs.' 56.1 ¶ 14.) Defendants also assert that D-Ram was responsible for the heating equipment, *i.e.*, maintaining a minimal level of heat in the space. (Defs.' 56.1 ¶ 15.) Plaintiff argues, however, that there is no testimony as to whether D-Ram had any responsibility to heat the area in the ceiling level where the sprinkler is located. (Graff Dep. Tr. at 19-20.) Defendants assert that, if there was a problem with the heating, D-Ram would pay for the repair. (*Id.*) Plaintiff argues, however, that D-Ram was only responsible for repairing the heating system in the usable tenant space and not the space above the ceiling area where the building sprinklers are located. (*Id.*)

There is no evidence of the actual temperature within D-Ram's premises at the time of the loss, but the evidence indicates that the heating system was in working order at that time. (Defs.' 56.1 ¶ 20.) There is no evidence as to who last set the temperature of the thermostat before the loss. (Defs.' 56.1 ¶ 34.) Although D-Ram was in control of the thermostat on the user level of the premises, D-Ram denies that they were in control of the temperature in the ceiling space. (Defs.' 56.1 ¶ 31.) Defendants contend that there was nothing atypical regarding the installation of

the sprinkler system nor the configuration of the heating system. (Defs.' 56.1 ¶ 29.) Defendants further argue that the sprinkler failure could have been the result of the thermostat temperature being lowered during the period when D-Ram had ceased its operations up to and including the loss date. (Defs.' 56.1 ¶ 30.)

Atlantic was a business and property insurance carrier for Allstar and D-Ram. (Defs.' 56.1 ¶ 1.) Allstar submitted the insurance claim that is the basis of Atlantic's subrogation claim. (Defs.' 56.1 ¶ 38.) The goods that were allegedly damaged were owned by D-Ram. (Defs.' 56.1 ¶ 36.) Defendants assert, therefore, that subrogor Allstar did not sustain a loss. (Defs.' 56.1 ¶ 35.) Plaintiff argues, however, that Allstar did sustain a loss as evidenced by the claim prepared for and submitted through Allstar's insurance policy with plaintiff. (Sheps Aff., Ex. 2, 3.) Tom Laviano worked with Mark Adler, a public adjuster, to prepare the insurance claim which was submitted to Atlantic. (Defs.' 56.1 ¶ 39.) Atlantic engaged NICE Networks to obtain values for the claim. (Defs.' 56.1 ¶ 40.) NICE Networks assigned Paul Willigan to the "Allstar Claim." (*Id.*) Willigan, in turn engaged Seville Electronic Trading Corp. to obtain prices for the computer chips in the insurance claim. (Defs.' 56.1 ¶ 41.) Steele adjusted upward of 15% the computer chip values Willigan provided. (Defs.' 56.1 ¶ 42.) Based upon a report from Steele dated, April 20, 2004, as a result of the January 11th loss, Atlantic paid Allstar $322,915. (Defs.' 56.1 ¶ 3.)

B. Procedural History

On October 17, 2005, Atlantic filed a complaint against Gold Coast alleging

damages resulting from Gold Coast's negligence, gross negligence, or careless and/or negligent omissions in installing and maintaining the sprinkler system on the premises. Additionally, Atlantic brought claims for breach of contract and breach of warranty. On March 20, 2006, Atlantic filed an Amended Complaint. On June 28, 2006, defendants answered the Amended Complaint. On November 9, 2007, defendants filed a motion for summary judgment and for an order precluding plaintiff's expert opinion testimony. The motion was fully submitted on January 4, 2007 and oral argument was held on February 12, 2008.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## III. DISCUSSION

Defendants have moved to exclude the testimony of plaintiff's two liability experts and for summary judgment on the negligence claim. The Court will address those issues in turn.

## A. Expert Testimony

Plaintiff asserts in its complaint that defendants' negligence in installing and maintaining the sprinkler system led to the freeze-up and property loss. As part of its proof, plaintiff offers the expert reports of Steve Pietropaolo, a mechanical engineer, and Alec Hicks, Jr., a property management expert.

Mr. Pietropaolo identified the following instances of defendants' alleged negligence, including: (1) the sprinkler piping was installed in an unheated area; (2) the system was not protected in any manner from the hazards of freezing; and (3) the landlord failed to properly protect the building from excess heat loss and allowed the system to remain installed in a non-code compliant fashion.

Mr. Hicks also identified the following instances of defendants' alleged negligence, including: (1) Gold Coast provided minimal maintenance for the sprinkler system; (2) inspections were minimal, and limited to those necessary to comply with insurance and code requirements; and (3) defendants' failure to check the building and advise tenants to raise thermostats in preparation for expected cold weather.

Defendants argue that the expert testimony and reports of Hicks and Pietropaolo are inadmissible under *Daubert*. In particular, defendants contend that Pietropaolo's opinions are unreliable because they are not based on sufficient factual information and he has not identified a technique, theory, methodology, or reasoning behind his conclusions. Similarly, defendants assert that Hicks's opinions are unreliable, speculative, lack principles or methodology, and are unhelpful to the jury. As set forth below, the Court disagrees and finds that their opinions are admissible under *Daubert* and are sufficient, in conjunction with the other evidence in the record, to create material issues of fact as to whether Gold Coast was negligent in installing and maintaining the sprinkler system.[2]

---

[2]  Although a Rule 104(a) pretrial evidentiary hearing is often necessary to address *Daubert* issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues and, thus, can be decided based on the written submissions and evidence. *See generally* Michael H. Graham, 2 *Handbook of Fed. Evidence* § 702.5 (5th ed. 2002) ("In light of the Supreme Court's emphasis of broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function."). Here, neither party requested such a hearing. Moreover, the objections to the expert testimony dealt with qualifications and methodology, and raised legal arguments based on undisputed facts about such qualifications and methodology. Thus, these *Daubert* issues could be decided based on the written record, which included reports, depositions, and an affidavit. Accordingly, the Court determined that a hearing was unnecessary under the particular circumstances of this case. *See, e.g., Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 248-49 (6th Cir. 2001) (holding that district court was not required to hold *Daubert* hearing before excluding evidence); *Oddi v. Ford Motor Co.,* 234 F.3d 136, 154-55 (3d Cir. 2000) (rejecting argument that *Daubert* hearing was required where court had reviewed record which included two depositions, a declaration, and an expert report); *see also Colon v. BIC USA, Inc.,* 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold

In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence. *See Nora Bevs., Inc., v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (stating that on summary judgment motion, "[a] district court properly considers only evidence that would be admissible at trial"); *accord Tamarin v. Adam Caterers,* 13 F.3d 51, 53 (2d Cir. 1993). Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

> Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . . the moving party is entitled to a judgment as a matter of law,' Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the

resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citations and footnotes omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Id.* at 66. Thus, if the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence. *Id.* at 66-67. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See G.E. v. Joiner*, 522 U.S. 136, 142-43 (1997). Accordingly, pursuant to Rule 104 of the Federal Rules of Civil Procedure, the Court must examine the admissibility of plaintiff's expert testimony in ruling on defendants' motion for summary judgment.

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

---

a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion.").

and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *see Daubert*, 509 U.S. at 593 n.10, the district court is the ultimate 'gatekeeper.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Under *Daubert*, the district court must perform the gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that whether the witness' area of expertise was technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) ("The shift under the Federal Rules to a more permissive approach to expert testimony . . . . did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely*, 414 F.3d at

396-97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *accord Nimely*, 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. GMC*, 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness'[] background when evaluating the witness'[] qualifications to testify as an expert.") (quoting 29 Wright & Gold, Fed. Prac. & Proc. § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.*, No. CV-03-0710 (TCP) (ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines,* 117 F.3d 76, 80 (2d Cir. 1997).

With respect to reliability, "'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of

reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *Williams*, 506 F.3d at 160 (quoting *Amorgianos v. AMTRAK.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal quotation marks omitted)). As the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos*, 303 F.3d at 266 (citations and internal quotations omitted); *accord Nimely*, 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *Kumho*, 526 U.S. at 151; *Nimely*, 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached,

*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, . . . by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert*, 509 U.S. at 592 n.10 ("These matters should be established by a preponderance of proof.") (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); *see also* Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility."); *accord Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003) (same).

### 1. Steven Pietropaolo

Defendants argue that Pietropaolo's opinions are inadmissible because they are

unreliable. Specifically, defendants argue the following: (1) "Pietropaolo's opinions are unreliable because they are not based upon sufficient factual information to support them, and he has not identified any technique, theory, methodology, or reasoning behind his conclusions" (Defs.' Memorandum of Law, at 26); and (2) he "cannot provide reliable or helpful opinion testimony because he accepts various alternative explanations for the cause of the loss" (*id.* at 30). As set forth below, applying the *Daubert* standard, there is no basis to exclude Pietropaolo's testimony.

Defendants argue that Pietropaolo's methodology was flawed in a number of ways, including, among other things, that he did not have personal knowledge of the setting of the thermostat, did not inspect the loss site until two months after the accident, and could not recall if he was wearing a coat during the inspection. However, the Court does not view any of the articulated deficiencies in testing and methodology sufficient to render Pietropaolo's opinion inadmissible under *Daubert*. Specifically, the Court has reviewed Pietropaolo's affidavit, report, and deposition in which he explained, among other things, he surveyed the area, examined the burst pipe, photographed the sprinkler system and damage, and physically experienced a draft under the door. (*See* Pietropaolo Dep. 41:1 - 42:3; 51:10-25; 53:3-11; 62:12-17 Aug. 9, 2007.) Based upon that inspection, he concluded the sprinkler system was installed in an unheated area, that the area was non-conditioned and the pipes were not insulated. (*See* Pietropaolo Dep. 94:12-16; 95:5-8 Aug. 9, 2007.) Pietropaolo further concluded that the sprinkler system froze because ice developed in the lines due to the pipes' location in a non-conditioned and unheated area. (Friedman Aff., Exh. 7.) In addition, Pietropaolo concluded that the sprinkler

system was not compliant with New York State's Uniform Fire Prevention and Building Code 850.7. *(See* Pietropaolo Dep. 96:8 - 97:14 Aug. 9, 2007); (Friedman Aff., Exh. 7.) In short, Pietropaolo's description of his methodology, which formed the basis for his conclusions, is sufficiently reliable under *Daubert* to allow his opinions to be admitted.

Defendants' argument that Pietropaolo's opinion must be excluded because he accepts the possibility of other alternative causes for the loss is similarly unavailing. As noted above, Pietropaolo concluded (1) "the water damage was a direct result of a sprinkler freeze-up"; (2) that "[t]he sprinkler heads froze and activated due to ice within the lines, which developed within the piping in the unheated, unconditioned space"; and (3) the accident was, in part, caused by the failure to protect the building from excessive heat loss and by the failure to install the system pursuant to Code. (Defs.' Ex. 7, at 2-3.) Although defendants correctly note that Pietropaolo also concluded that "a low thermostat setting could have also contributed to the event," the failure to eliminate the low thermostat as a potential contributing cause does not render his conclusion unreliable. *See, e.g., U.S. Info. Sys., Inc. v. IBEW Local Union Number 3, AFL-CIO,* 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004) ("Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious causes. An expert is not required, however, to categorically exclude each and every possible alternative cause."); *see also Ambrosini v. Labarraque,* 101 F.3d 129, 140 (D.C. Cir. 1996) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not the soundness of the methodology.") (citation omitted). Accordingly, Pietropaolo's

proposed testimony satisfies the requirements of *Daubert*.

## 2. Alec Hicks, Jr.

Defendants argue that the testimony of Hicks should also be precluded because: (1) Hicks's testimony is *ipse dixit*; (2) any opinion Hicks might give upon who was responsible for the heat would go to the ultimate legal issue; (3) Hicks's opinion is unreliable because it is based on his experience and not on his qualifications as an engineer or the application of technical knowledge; (4) Hicks's opinion is entirely speculative; (5) Hicks's opinion does not assist the trier of fact in understanding the data. (Defs.' Memorandum of Law, at 32-33.) However, after reviewing the record related to Hicks, the Court concludes that there is no basis to exclude his testimony under *Daubert.*

As a threshold matter, the Court notes that Mr. Hicks has spent over 35 years managing, operating, and maintaining real estate and has testified in both federal and state courts around the nation. (Friedman Aff., Exh. 8.) Mr. Hicks also has a degree in Mechanical Engineering and is registered as a professional engineer. (*Id.*) Hicks's educational background and professional experience qualifies his testimony under the requirements of Federal Rule of Evidence 702, as he has gained "specialized knowledge" through "experience, training, or education." *See, e.g. McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) (holding a clinician's extensive experience sufficient to permit him to opine that the plaintiff's medical condition was caused by exposure to a toxin).

After a review of deposition testimony and expert reports, Mr. Hicks concluded that Gold Coast: (1) "was responsible for maintenance of the sprinkler system, including assuring adequate heat was available to prevent freezing"; (2) "failed to maintain the sprinkler system and to ensure that adequate heat was available to prevent freezing"; and (3) thereby caused the freeze-up. (*Id*.)

Although defendants contend that Hicks's testimony will not assist the trier of fact, the Court disagrees. It is not within the common knowledge of an average juror as to what steps and/or procedures that a landlord can utilize in the design and maintenance of a sprinkler system to avoid freezing in cold weather. Hicks is qualified, based on his educational and professional experience and review of the basic factual information in the instant case, to testify about what measures, as outlined in his report, could be taken to avoid freezing, including building insulation, door and window weather stripping, and heating sources. (*Id.*) It would also assist the jury to understand how, consistent with insurance and code requirements, commercial property owners can conduct periodic inspections, including with the use of gauges, to address this potential problem. (*Id.*) In short, the Court concludes that Hicks is qualified to testify about such measures, his testimony regarding such measures is sufficiently reliable to be admissible, and would assist the trier of fact. Thus, the motion to exclude his entire testimony is denied.[3]

---

[3] Although the Court concludes that Hicks's testimony regarding steps or procedures available to a landlord (in connection with preventing freeze-ups of sprinkler systems) will assist the trier of fact in determining the issue of negligence, the Court will not permit Hicks (or any other witness) to provide an ultimate legal conclusion as to whether the defendants were negligent. As the Second Circuit noted, in finding that the district had erred in allowing a witness to testify that the

In sum, the Court recognizes that defendants have pointed potential flaws in Pietropaolo's and Hicks's methodology and opinions. However, given that there is sufficient indicia of reliability to allow admission of their testimony, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citations and quotations omitted); *accord Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that

_____

defendant was negligent:

> Although testimony that embraces an ultimate issue to be decided by the jury is not inadmissible *per se,* Fed. R. Evid. 704, it should not be received if it is based on inadequately explored legal criteria. . . . The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.

*Andrews v. Metro North Commuter R. Co.,* 882 F.2d 705, 709 (2d Cir. 1989); *see also Hygh v. Jacobs,* 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Strong v. E.I. DuPont de Nemours Co.,* 667 F.2d 682, 685-86 (8th Cir. 1981) (holding that question of whether lack of warnings rendered product unreasonably dangerous was for jury to decide, and should not be the subject of expert testimony). Thus, the Court will not allow Hicks or other experts to express their ultimate opinion on the legal conclusion of negligence.

solidly and indisputably proven to be reliable"); *McCullock,* 61 F.3d at 1044 (finding expert testimony properly admitted where "[d]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony").

## B. *Res Ipsa Loquitur*

Defendants seek summary judgment on plaintiff's negligence claim on the ground that, among other things, there is insufficient evidence to support such a claim. In response to defendants' summary judgment motion, plaintiff argues that summary judgment is precluded by the doctrine of *res ipsa loquitur*. Defendants, however, contend that, as a matter of law, plaintiff cannot meet the requirements of *res ipsa loquitur.* As set forth below, the Court finds defendants' position unpersuasive and concludes, viewing the evidence most favorable to plaintiff and drawing all reasonable inferences in its favor, there is sufficient evidence from which a reasonable jury could find the application of the *res ipsa loquitur* doctrine in this case.

The doctrine of *res ipsa loquitur* may be applied where "(1) the event must be of a kind which ordinarily does not occur in the absence of negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *Payless Discount Ctrs, Inc. v. 25-29 N. Broadway,* 443 N.Y.S.2d 21, 21 (App. Div. 1981). Thus, "[t]he doctrine permits a plaintiff to establish a prima facie case of negligence without proving elements usually necessary to state a negligence claim." *St. Paul Fire and Marine Ins. Co. v. Tag 380,*

*LLC*, No. 05 Civ. 4917 (DC), 2007 WL 2872464, at * 5 (S.D.N.Y. Sept. 27, 2007).

In fact, this doctrine has been applied to instances where sprinkler systems have failed or water pipes have burst. *See, e.g., Reade v. SL Green Operating P'ship, LP,* 817 N.Y.S.2d 230 (App. Div. 2006); *Payless Discount Ctrs, Inc.,* 443 N.Y.S.2d at 21; *Pandozy v. Kalmen,*673 N.Y.S.2d 121 (App. Div. 1998); *Dillenberger v. Fifth Ave. Owners Corp.,* 547 N.Y.S.2d 296 (App. Div. 1989) (water pipes burst); *see also De Witt Props. v. City of New York,* 44 N.Y.2d 417, 426 (N.Y. 1978) ("The doctrine has been applied to water main breaks. . . . and this type of event has frequently been cited as a typical example of case where the doctrine is commonly applicable."). Specifically, New York courts have held, that "where the owner is in exclusive possession and control of the system, it is reasonable to presume that any break in the system was caused by the owner's neglect." *Payless Discount Ctrs, Inc.,* 83 A.D.2d at 961. In other words, "[s]prinkler pipes do not ordinarily break if they are properly installed and maintained." *Id.*; *accord Ever Win, Inc. v. 1-10 Indus. Assoc., LLC,* 827 N.Y.S.2d 63 (App. Div. 2006).

Although defendants make several arguments as to why summary judgment on the *res ipsa loquitur* claim is warranted, the Court finds those arguments unpersuasive. First, defendants argue that *res ipsa loquitur* does not apply here as a matter of law because "the New York metropolitan area was subject to a record-breaking cold snap" in January 2004 and "[g]iven the period of unusually low temperatures, it cannot be said that a freeze-up would not have occurred absent someone's negligence." (Defs.' Reply Memorandum, at 6.) According to defendants, "[h]igh temperature in the area on the day of the loss

and two preceding days were between 12° and 28°F; lows were between 1° and 6° F." (*Id.*) Plaintiff counters that the cold spell in January 2004 was well-publicized before it occurred and thousands of buildings in the New York area did not experience freeze-ups. (Pl.'s Opposition Memorandum, at 9.)

In *St. Paul Fire Fire and Marine Insurance Company*, this precise argument was made in connection with a negligence claim arising from a freeze-up and rupture of pipes in a building in Manhattan on the exact date as the events in this lawsuit – namely, January 11, 2004. In denying defendants' summary judgment motion on the *res ipsa loquitur* issue, the court explicitly rejected the argument that it was so cold in New York City in January 2004 that the doctrine should not apply:

> The Owners . . . argue that they are entitled to summary judgment dismissing the *res ipsa* claim because the damage was the result of an "act of God" – unusually cold weather. This claim fails because the temperature here were not unexpected for a New York City winter.

2007 WL 2872464, at *6. In this case, the Court also concludes that there is insufficient evidence in the record from which to conclude, as a matter of law, that the cold weather on Janaury 11, 2004 was so extreme and so unanticipated that the *res ipsa loquitur* doctrine cannot be applied.

Second, defendants contend that *res ipsa loquitur* cannot apply because they did not have exclusive control of both the sprinkler system *and* the heating system. In particular,

defendants argue that D-Ram had control over the thermostat and the heat. However, New York courts have been clear that "the concept of exclusive control does not require rigid application since the general purpose of this element is to indicate from the circumstances that it probably was the defendant's negligence which caused the accident." *Payless Discount Ctrs, Inc.*, 443 N.Y.S.2d at 21; *see also Corcoran v. Banner Super Market*, 19 N.Y.S.2d 425, 432 (N.Y. 1967) ("The exclusive control requirement is thus subordinated to its general purpose, that of indicating that it probably was the defendant's negligence which caused the accident.") Here, as conceded at oral argument, there is no dispute that the defendants had complete control of the installation and maintenance of the sprinkler system. Although defendants assert that D-Ram may have turned down the thermostat and caused the pipes to freeze (Defs.' Reply Br., at 8), defendants have not pointed to any evidence to establish that D-Ram turned down the thermostat, nor have they provided evidence to indicate at what temperature the thermostat was set on the day of the incident. The mere possibility that D-Ram could have made the building colder is not sufficient to conclude, as a matter of law, that defendants did not have a level of exclusive control over the sprinkler system to allow for the application of *res ipsa loquitur.* If that were the rule, *res ipsa loquitur* could never have been applied in the above-referenced cases, including *Payless Discount Centers*, because there is always the possibility that, despite a landlord's exclusive control over the sprinkler system, a third party (including a tenant) could do something to lower the temperature in the building. Instead, given it is undisputed that Gold Coast had exclusive control over the sprinkler system, plaintiff should be able to argue *res ipsa loquitur* to the jury.

This type of issue was addressed by the Second Circuit in *Stone v. Courtyard Management Corporation,* 353 F.3d 155 (2d Cir. 2003). In *Stone*, the defendant hotel argued that the automatic doors were not in its exclusive control because, among other things, the public passed through them every day. In reversing the court's decision to grant summary judgment for the defendant, the Court explained how public access to the doors did not eviscerate the potential application of the doctrine of *res ipsa loquitur*:

> We turn first to the failure of plaintiff to proffer any "evidence to exclude the possibility that the operation of the automatic doors could have been affected adversely by the many persons passing in and out of the entrance of the Hotel every day." The district court applied the wrong standard. It was not necessary for the plaintiff to altogether eliminate the possibility of other causes of the injury – causing malfunction, but "only that their likelihood must be so reduced that the greater probability lies at defendant's door." *Dermatossian v. New York City Transit Auth.,* 67 N.Y.2d 219, 227, 501 N.Y.S.2d 784, 492 N.E.2d 1200 (1986) (quoting 2 Harper and James, Torts § 19.7, at 1086).

*Stone,* 353 F.3d at 157-58. Here, as in *Stone,* there is sufficient evidence from which plaintiff is able to argue to the jury that the likelihood of any lowering of the thermostat

by D-Ram was so reduced that the greater probability for the incident lies at Gold Coast's door.

In sum, as the Court found in *St. Paul Fire and Marine Insurance Company,* this Court concludes that defendants' motion for summary judgment on the *res ipsa loquitur* claim must be denied.[4]

---

[4] Even if the doctrine of *res ipsa loquitur* was not applied, genuine issues of material fact would still exist as to plaintiff's claim of negligence. In order to defeat a motion for summary judgment in a negligence action, plaintiff must "introduce adequate evidence on each element of negligence sufficient to support a favorable jury verdict [,and]. . . . in cases where proof of any essential element falls short the case should go no further." *Basso v. Miller*, 40 N.Y.2d 233, 242 (N.Y. 1976). Under New York law, a plaintiff must establish the following elements to prove negligence: (1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged. *See Van Nostrand v. Froehlich*, 844 N.Y.S.2d 293, 293 (App. Div. 2007); *Luina v. Katharine Gibbs School N.Y., Inc.*, 830 N.Y.S.2d 263, 263 (App. Div. 2007); *Talbot v. N.Y. Inst. of Tech.*, 639 N.Y.S.2d 135, 135 (App. Div. 1996). Under New York law, "[i]t is well established that a landowner is under a duty to maintain its property in a reasonably safe condition . . . . In order to subject a property owner to liability for an alleged breach of this duty, the plaintiff must demonstrate that the owner created, or had actual notice or constructive notice of the hazardous condition which precipitated the injury. Liability based on constructive notice may only be imposed where a defect is visible and apparent and has existed for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Trano v. Federated Dep't Stores, Inc.*, No. 851/03TSN, 2006 WL 3524377, at *1 (N.Y. City Civ. Ct. Dec.

## C. Volunteer Doctrine and Request to Amend the Complaint

Subrogation "allows an insurer to stand in the shoes of its insured and seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *Kaf-Kaf, Inc. v. Rodless Decorations,* 90 N.Y.2d 654, 660 (N.Y. 1997). However, "an insurer which pays a loss for which it is not liable thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an agreement therefor." *Nat'l Union Fire Ins. Co. v. Ranger Ins. Co.,* 599 N.Y.S.2d 347, 347 (App. Div. 1993) (citations and quotations omitted). As

---

6, 2006). In this instance, genuine issues of material fact exist as to both actual and constructive notice. Specifically, plaintiff has offered evidence about cold air infiltration due to a lack of molding. Defendants argue, however, that the molding was likely removed after D-Ram left the premises. Further, genuine issues of material fact exist as to whether D-Ram assumed the risk. Defendants argue that, because Laviano had a role with both D-Ram and Gold Coast, any knowledge Tom Laviano had as the owner of Gold Coast would be imputed to D-Ram. Defendants further argue Laviano had knowledge of the particulars of the sprinkler system and, therefore, knew the effect of raising or lowering the heat. Plaintiffs assert, however, that there were multiple employees who did not work for both Gold Coast and Allstar or D-Ram. Further, there is no conclusive proof that Mr. Laviano adjusted the temperature. Therefore, material issues of fact exist as to whether D-Ram assumed the risk. Finally, other arguments that defendants have raised regarding the absence of evidence of proximate cause cannot be decided as a matter of law in this case given the disputed facts discussed *supra.* Accordingly, defendants' motion for summary judgment is similarly denied on these grounds.

one court noted, "[t]he volunteer doctrine is not automatic, and an insurer does not lose the right to recover simply because it settled noncovered claims." *Ams. Ins. Co. v. Stolt-Nielsen, Inc.,* No. 97 Civ. 8018 (RCC), 2004 WL 2199497, at *6 (S.D.N.Y. Sept. 30, 2004). In particular, "[a]n insurer is not a volunteer when it makes a good-faith payment under a reasonable belief that such payment is necessary to protect itself." *Id.*

Defendants argue that "[t]he undisputed evidence shows that Atlantic is not entitled to maintain a claim in subrogation against Gold Coast because its subrogor Allstar did not incur any property damage as a result of the subject loss." (Defs.' Memorandum of Law, at 21.) In other words, the property damage in connection with the loss was to D-Ram and not Allstar, which was the corporation to which Atlantic made payment. Defendants contend, given Allstar has no rights against Gold Coast and Atlantic voluntarily paid Allstar for losses incurred by D-Ram, Atlantic did not become subrogated to any rights when it paid Allstar.

Plaintiff counters that this is, at best, a technical defect. Specifically, plaintiff explains:

> Allstar presented a claim to their property insurer contending the damages were to their own goods. As noted extensively in the defendants motion papers, there was a great interrelation between Allstar Electronics and D-Ram. Perhaps it was just easier for them to submit a claim under Allstar's name, but the fact is this issue is irrelevant, because <u>D-Ram was</u>

<u>covered under the very same policy of insurance, policy number, and the exact same coverages and ultimate payments would have been made</u>. All claims and allegations are identical.

Pl.'s Memorandum of Law, at 20 (emphasis in original). Thus, plaintiff contends that it acted in good faith under a reasonable belief that such payment was necessary. In any event, in its opposition, and again during oral argument on February 12, 2008, plaintiff requested permission to amend the complaint to include D-Ram as a named party to this action to correct this purported defect.

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings by leave of the court, and further directs that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Indeed, "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Absent "undue delay, bad faith, or dilatory motive on the part of movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also McCarthy*, 482 F.3d at 200 ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party. However, '[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion.'") (quoting *Min Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)) (internal citation omitted).

The Court finds that there has been no "undue delay, bad faith or dilatory motive" by plaintiff, nor does the Court find that defendants will suffer undue prejudice from the amendment. There would be no additional discovery because all the documents, witnesses, allegations, and legal issues in the case are the same if the amendment is allowed. To the extent that defendants argue that any such amendment would be futile, the Court disagrees. There is no basis for concluding, as a matter of law, that plaintiff is barred from pursuing recovery for payments made under a valid policy merely because the payments were issued to Allstar, another named insured under the same policy of insurance. *See Ocean Accident and Guarantee Corp. v. Hooker Electro-chemical Co.,* 240 N.Y. 37 (N.Y. 1925) ("subrogation ought to be liberally applied for the protection of those who are its natural benficiaries"); *accord Fed. Ins. Co. v. Arthur Andersen & Co.,* 75 N.Y.2d 366 (N.Y. 1990). Instead, this is an issue for the trier of fact. Moreover, plaintiff can also argue, based on the evidence of interrelatedness between Allstar and D-Ram, that it had a reasonable basis for relying on the existence of an agency relationship between Allstar and D-Ram, such that there is no basis for invalidation of its right to subrogation.

In sum, plaintiff's request to amend the complaint to include D-Ram as a named party to this action is granted and defendants' request for summary judgment on the basis of the volunteer doctrine is denied.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment and to preclude the testimony of Atlantic's experts, Steve Pietropaolo and Alec Hicks, Jr., is DENIED.

Plaintiff's request to amend the complaint is GRANTED. Plaintiff shall file and serve the Amended Complaint by April 21, 2008.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: April 8, 2008
Central Islip, New York

* * *

The attorney for plaintiff is Robert Sheps, of Sheps Law Group P.C., 35 Pinelawn Road, Suite 106E, Melville, NY, 11747. The attorney for the defendants is Daniel J. Friedman, of Abrams, Gorelick, Friedman, & Jacobson, P.C., One Battery Park Plaza, 4th Floor, New York , NY 10004.